#24896-rev & rem-MILLER, Retired Justice

**2009 SD 16**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JOHN T. MOORE,                                                      Plaintiff and Appellant,

v.

DENICE L. MOORE,                                                Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE LORI S. WILBUR
Judge

\* \* \* \*

LINDA LEA M. VIKEN of
Viken Law Firm
Rapid City, South Dakota                         Attorneys for plaintiff
                                                                    and appellant.


ROBERT C. RITER, JR. of
Riter, Rogers, Wattier & Northrup, LLP
Pierre, South Dakota                                  Attorneys for defendant
                                                                    and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 12, 2009

OPINION FILED 03/11/09

#24896

MILLER, Retired Justice

[¶1.]        Denice Moore (Denice) brought this action seeking to increase the amount of alimony she receives from her ex-husband, John Moore (John).  After hearings, the circuit court increased the monthly alimony payments from $100 to $1,500.  She was also awarded costs in the amount of $1,093.43.  John appeals.  We reverse and remand.

## FACTS

[¶2.]        John and Denice were married in 1975.[1]  In 1999 Denice was diagnosed with Multiple Sclerosis (MS).  In March 2001 John left the marital home, retired from his employment, and moved to Iowa to care for his mother, before moving to Florida and ultimately to Texas.

[¶3.]        John and Denice were divorced on December 10, 2003.  Prior thereto, they entered into a property settlement, which was incorporated into the final decree of divorce.  The agreement and ultimate decree of divorce gave approximately 13% of the marital assets to John and 87% to Denice.  John, who was then unemployed, also agreed to pay $100 per month in alimony.  These payments were to continue until Denice's death, remarriage, or until she reached the age of 65.

[¶4.]        The day before the divorce was finalized, Denice entered into an agreement to sell the marital home to Russell Dulany (Russell).  Soon thereafter,

---

1.    The date of marriage is uncontested, however, the findings are inconsistent with the record.  The findings state that the parties were married on September 27, 1985, which is obviously a typographical error.  The record clearly reflects that they were married in 1975.

- 1 -

she moved to Iowa to be closer to her children and to receive MS treatment. Russell assisted her with the move. Several months later, Russell helped Denice return to Pierre, South Dakota. Since then they have cohabitated in the former marital home.[2]

[¶5.] Denice was employed by Russell's car dealership until March 2007, when her illness prevented her from further employment there.[3] She continued to receive a salary from Russell's car dealership during a time when she was employed by the Pierre Chamber of Commerce as well as while she lived and worked in Iowa. At the time of the current modification hearings, Denice continued to be on the car dealership's health insurance plan.

[¶6.] Since the divorce, John has remarried, moved to Austin, Texas, and has had minimal employment outside of the home. His new wife, Luanna Bowen, earns a substantial income, which allows John to be, what he terms, a "house husband." His primary source of income since the divorce has been from an inheritance he received from his mother as well as gifts given to him by her before her death.

[¶7.] Denice initiated the petition for alimony modification in late 2006. The first hearing was held on July 17, 2007. However, the proceedings were postponed

---

2. Denice and Russell's relationship is variously described as caretaking or friendship. The two share a bed and have had sexual relations. Russell provides financial support to Denice and manages her financial affairs.

3. Denice's affidavit in support of modification, filed November 22, 2006, states that she had not been able to maintain full-time employment since mid-September 2004. However, her IRS returns reflect that she earned $39,195 in 2005, and $32,009 in 2006.

after Denice revealed bank records relevant to her expenses, which had been previously undisclosed.

[¶8.] On August 16, 2007, Denice began receiving a special treatment for MS called Tysabri. Among other changes, she then modified her expense budget to include the Tysabri treatment. At the time of the January 2008 modification hearing, Denice was unable to quantify the cost *to her* of the Tysabri treatment. Her insurance provider had not yet determined the amount of these costs it would cover. Additionally, she was waiting for a response from the Department of Social Security regarding disability payments.

[¶9.] The final trial court hearing was held January 17, 2008. Denice offered evidence of Luanna's income and financial holdings[4] as evidence of John's ability to pay increased alimony. The trial court ultimately increased John's monthly alimony payment from $100 to $1,500. Denice also requested costs and attorney's fees. The trial court denied attorney's fees but ultimately granted costs in the amount of $1,093.43.

[¶10.] John appeals, raising two issues:

1.  Whether the trial court abused its discretion by increasing the alimony payments from $100 to $1,500 per month.

2.  Whether the trial court abused its discretion in granting taxation of costs in the amount of $1,093.43.

---

4.  These financial holdings included the value of the home which was owned solely in Luanna's name and two rental properties, also owned solely by Luanna. John provided approximately $110,000 toward the marital residence with money from his inheritance.

## STANDARD OF REVIEW

A circuit court's decision regarding whether to modify an alimony award is reviewed under the abuse of discretion standard. "An abuse of discretion is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." We review the circuit court's findings of fact under the clearly erroneous standard and conclusions of law de novo.

Lowe v. Schwartz, 2007 SD 85, ¶9, 738 NW2d 63, 66-67 (citations omitted).

[¶11.]     "Our task in reviewing a trial court's decision is not to determine whether we would make the same decision, but whether, in view of the circumstances of the case and the applicable law, the trial court could have reasonably reached the conclusion it did." Olson v. Olson, 1996 SD 90, ¶9, 552 NW2d 396, 399 (quoting Havens v. Henning, 418 NW2d 311, 312 (SD 1988)).

## ANALYSIS AND DECISION

[¶12.]     Circuit courts may from time to time modify a divorce award of support lasting for a lifetime or shorter duration, giving consideration for the parties' change in circumstances, as provided by SDCL 25-4-41. We have held that circuit courts have continuing jurisdiction to modify permanent alimony as circumstances may require. Saxvik v. Saxvik, 1996 SD 18, ¶11, 544 NW2d 177, 180.

When the trial court considers evidence as to a change in circumstances, it must be careful to confine its review to changes occurring *since the time of the divorce*. The court is not to reflect on whether the decree was "equitable" when entered, but only whether the economic circumstances of the parties have changed since the award such that the original award is now either insufficient or excessive. The role of trial courts in modification proceedings is not to relieve a party of his or her bad bargain. "[T]he original decree is . . . res judicata except in cases of changed circumstances subsequently arising, and proceedings for modification cannot be used to review the equities of the original decree."

*Olson*, 1996 SD 90, ¶11, 552 NW2d at 399-400 (citations omitted) (emphasis added).

[¶13.]     "The change in circumstances refers to a change in the *necessities* of the recipient and the *financial ability* of the obligor." Horr v. Horr, 445 NW2d 26, 28 (SD 1989) (citing Dougherty v. Dougherty, 76 SD 318, 77 NW2d 845 (1956); Guinter v. Guinter, 72 SD 554, 37 NW2d 452 (1949)) (emphasis added). Although the change need not be substantial, mere proof of a change is insufficient to mandate modification. *Saxvik,* 1996 SD 18, ¶21, 544 NW2d at 182. "The burden of proving such a change in circumstances is on the *party seeking modification.*" Paradeis v. Paradeis, 461 NW2d 135, 137 (SD 1990) (citing Wegner v. Wegner, 391 NW2d 690 (SD 1986)) (emphasis added). And, we reiterate that we review the trial court's holdings on an abuse of discretion standard.

[¶14.]     "In considering the financial necessities of Wife and the ability of Husband to pay, both *income* and *expenses* of the parties must be considered." *Horr,* 445 NW2d at 28 (emphasis added). Our decisions have closely scrutinized the gross income and expenses which might affect the obligor's ability to pay or the recipient's need. Several factors to consider include: the intentional reduction of gross income; an inquiry into earning potential when a party is under- or unemployed; the intentional inflation of expenses; and the offsetting effect of cohabitation on expenses.

[¶15.]     Just as courts must be wary of an alimony obligor's efforts to minimize his or her ability to pay through under- or unemployment, courts must also consider conduct by the alimony recipient to maximize his or her unmet needs through speculative expenses and the minimization of support provided by their live-in

cohabitants. This vigilance is especially necessary when the recipient is the moving party who carries the burden of proving a change in circumstances.

[¶16.]     John contends that the facts do not demonstrate a change in circumstances sufficient to justify a modification of the alimony award. He argues that the trial court erred in its conclusions by inappropriately attributing his current wife's income to him and by inadequately considering the support provided by Denice's live-in boyfriend (Russell). He further asserts that the testimony and evidence provided by Denice was insufficient to satisfy her burden of proving a change in either her economic needs or his financial ability to pay.[5]

### I. Denice's Need

> When assessing increases in the *recipient's need* for alimony, the trial court must consider both increases in the *actual expenses* of the recipient and changes in the recipient's *non-support income*.

*Olson*, 1996 SD 90, ¶13, 552 NW2d at 400 (emphasis added).

### A. Non-support income

[¶17.]     It is not disputed that Denice has become physically unable to work due to MS.[6] Clearly, a change in circumstances exists as to her non-support

---

5.     There was no recitation in the property settlement agreement or the final decree that $100 per month was an insufficient or inappropriate amount to support Denice at the time of divorce. This factually distinguishes this case from the alimony modification rationale used in *Olson v. Olson*, 1996 SD 90, 552 NW2d 396. Thus, Denice's significant reliance on this authority is misplaced.

6.     Although John has not challenged her inability to continue employment, he challenges the medical diagnoses of Denice's symptoms and the cause of the progression of Denice's MS since the divorce. Among other arguments, he suggests that Denice did not take her MS prescription medication, Rebif, that

(continued . . .)

income.  But, the hearing testimony and evidence does not reveal her post-employment income.  At the modification hearing, Denice admitted that the amount of her disability and social security income had not yet been determined.  Therefore, the trial court was premature in assessing Denice's income.

### B.  Actual Expenses

[¶18.]        This case presents an unusual situation in which the recipient spouse is seeking an upward modification while cohabitating with another.  Since the moving party bears the burden of proving a change in circumstances sufficient to necessitate the modification of alimony, Denice must establish that her *actual* expenses and financial needs for support are unmet.  Because of her cohabitation, Denice must also prove the financial effect, if any, cohabitation has on these needs and expenses.  She has failed to meet these burdens.

### 1.  Budgeted expenses

[¶19.]        Denice presented several budgets to the trial court during the course of these proceedings.  Interestingly, none of the expenses itemized in these budgets met or exceeded her claimed budgetary needs at the time of the divorce.  In 2003 her budgeted monthly expenses were $3,674.  At the initiation of the modification proceedings in November 2006, her monthly expense budget was $2,172.  In Denice's response to interrogatories, provided in 2007, her monthly expense budget was increased to $3,057.  By the time of the first hearing, her monthly budgetary

---

(. . . continued)
    she self-medicated with marijuana, and that some of her symptoms are caused by other, non-MS, ailments.

needs total was again altered to $3,389 – still approximately $300 less than her needs at the time of the divorce.

[¶20.] Most importantly for our purposes, Denice testified that the budgets she prepared did not reflect costs she *actually* paid, but rather were what she and Russell thought were "fair of what the cost was to live where *we're* [plural] at." (Emphasis added.) Finding of Fact § 59 states: "In order to be able *to live independently*, [Denice] would have expenses in the approximate sum of $3,389 monthly." (Emphasis added.) But, Denice does not live independently; she cohabitates with Russell. Her obligation is to substantiate her *actual* needs, not merely the hypothetical amount necessary to live independently. Furthermore, it would be insufficient for her to claim one-half of the living expenses in the home she shares with Russell if they are not her *actual* expenses. Finally, John presented documentary evidence that refuted Denice's proposed budgets. Denice's bank records, provided to John only *after* the first hearing for modification, reflect that Denice's *actual* expenditures are less than $1,000 per month.

[¶21.] While budgets are, in essence, estimates and by their nature inexact, the evidence provided by Denice is wholly inconsistent with itself and goes beyond the pale of acceptable ambiguity. By accepting these speculations, the moving party was relieved of her burden of proof and the decision was based on speculation and guesswork as to Denice's living and medical expenses.

2. Living Expenses & Cohabitation

[¶22.] In general, "cohabitation, in and of itself, is not a circumstance upon which alimony may be modified or terminated." *Horr*, 445 NW2d at 28 (citing

Myhre v. Myhre, 296 NW2d 905 (SD 1980)). Typically, it is the obligor spouse who raises cohabitation as a change of circumstance warranting a decrease in alimony. In this case the recipient of the alimony is the moving party seeking an increase due to the change in her health.

[¶23.]    Cohabitation may affect the financial needs of the recipient. *Id.* "[C]ohabitation by an alimony recipient is to be considered a sufficient change of circumstances for alimony modification only when it affects the financial needs of the recipient." *Myhre,* 296 NW2d at 908. "We . . . must determine if [the recipient's] economic well-being was enhanced by her act of cohabitation." *Id.* In this case, Denice has a double burden, proving her economic needs and disproving that her economic well being was enhanced by cohabitation. She has failed to do so.

[¶24.]    Denice's testimony disclosed that Russell controls her finances. She repeatedly was unable to respond to questions regarding her finances or provide a consistent account of her financial situation. In light of this, Russell's total absence from these proceedings[7] contributed to Denice's failure to overcome her evidentiary burdens. She repeatedly deferred to his sole knowledge of her finances, without calling him to substantiate her claims. His absence is particularly noticeable given Denice's repeated reliance on evidence of Luanna's finances in considering John's ability to pay.

[¶25.]    No burden was imposed on Denice to prove her economic circumstances. The trial court's holding gave an unreasonable level of deference to

---

7.    The record contains no testimony, affidavit, or other evidence from Russell.

Denice's testimony given her admitted lack of knowledge and failure to substantiate her estimations.

### a. Russell's support

[¶26.] Denice presented evidence and testimony at the hearings which would indicate that all of her living expenses have been met by Russell without any expectation of reimbursement. As the moving party, she failed to show why *John* should be required to pay greater alimony when her living expenses are, in reality, being voluntarily met by Russell.

[¶27.] In the absence of any direct evidence of Russell's contributions, we find the greatest indicator of his support is the increase of Denice's net wealth, and, in particular, the manner by which she has increased her assets. At the modification hearing, Denice's net assets totaled $179,737, an increase of almost $57,000 since the divorce.[8] Her assets have increased, in large part, from her monthly investment in $500 certificates of deposit (CDs). These CDs were funded by the monthly $100 alimony payments from John, $262 received by her in payment on a contract for deed from a property in Council Bluffs, Iowa, that Denice received in the divorce settlement, and an additional $138 per month provided by Russell.

[¶28.] The sources of this funding reflect several inconsistencies in Denice's financial claims. First, she has not used the alimony payments to support herself or

---

8.      These figures do not take into account that the marital home was sold to Russell for approximately $30,000 less than the appraised value. *See* ¶30, *infra.*

to defer her living expenses.[9]  Second, this circumstance and the evidence as a whole suggest that Russell has paid Denice's living expenses without the expectation of repayment or reimbursement.  While in control of Denice's finances, Russell did not allocate the alimony or contract for deed monies to reimburse himself to defer living expenses.  To the contrary, he provided additional financial support toward the purchase of these CDs.  This history strengthens John's argument that Denice's financial position has been enhanced by cohabitation, precluding such a significant increase in alimony.

[¶29.]      Records indicate that Denice was the owner of the CDs as of December 31, 2007.  Less than three weeks later, at the modification hearing on January 17, 2008, Denice claimed to have transferred the CDs to Russell as reimbursement for medical expenses paid by him.  Only Denice's testimony was presented to explain or substantiate this transfer.[10]  No evidence was presented to indicate which medical

---

9.    The alimony provided for in the Moores' divorce expires when Denice reaches 65 years old.  This suggests that these payments were not intended for her indefinite, long-term support.

10.    Denice testified as follows:

> After the first of the year I sat down and talked with Russell because the expenses were really – was really a lot.  And I just said, "All the CD's that have my name on them, take them all and use them for medical expenses."  And he did.  Now, I don't know which ones he did.  Russell handles most of this.

> And I just said, "I don't want – just take them all, take my name out of them.  You know, you have absorbed more than what you should probably and put them all – you take them all."  And that's – so what he's cashed – I know he cashed one or two.  I don't know exactly which ones he's cashed, no, but he cashed some for medical expenses.  And if he's cashed every one of

(continued . . .)

expenses Russell had paid. Even so, Finding of Fact § 20 provides, "[Denice] has cashed in all but one of the CD's held solely in her name to reimburse Russell Dulany for part of the medical care costs he had paid." Under these circumstances, without reliable and persuasive proof, we cannot accept that this asset transfer is worthy of consideration. The moving party's actions must be scrutinized for any attempts to hide or minimize assets, increase their financial needs, etc. We believe that the trial court put no such burden on Denice to explain this "eleventh hour" transfer.

### b. Sale of Marital Home

[¶30.] In December 1999 the marital home was appraised at $205,000. In 2003, one day before the divorce was finalized, Denice entered into a purchase agreement to sell it to Russell for $175,000. (Denice used the proceeds of the sale to pay off the mortgage loan on the home.) In doing so, she deprived herself of a residence, a major asset provided for her in the divorce (not to mention the loss to her net worth through the difference between the sale price and the fair market value of the home). And, as indicated above, some months later, she returned to live with Russell in that same home.

[¶31.] In effect, Denice has voluntarily reduced her assets and deprived herself of ownership of a residence, which would seemingly make her appear in greater need. However, she continues to live in the same house. In her expense budgets, Denice claimed to pay $600 a month in rent, though no evidence was

_____

(. . . continued)
    them, I don't know. I just know that they are no longer in my name.

presented which substantiate this claim.[11]  Despite her cohabitation and absent evidence that she is *actually* paying the expense, Denice would have John's financial support for this expense.  That is inappropriate and not permitted by law.

### 3. Medical Expenses

[¶32.]  On appeal, Denice asserts that "it is undisputed that [her] Tysabri treatment cost her over $3,000 monthly."  The $3,000 figure comes from a document received from her insurance provider, Defendant's Exhibit W.[12]  However, this document clearly states, "This is NOT a Bill." (Emphasis original.)  Furthermore, Denice's *own* budgets dispute the $3,000 amount.

[¶33.]  While discussing Exhibit W, Denice testified that she believed her insurance would cover these expenses.  "Q:  Now, Ms. Moore, why are you taking this treatment if you don't have the money to pay for it?  A:  I'm optimistic that they will cover this through my Blue Cross and Blue Shield."  Later, on cross-examination, she added, "My insurance hopefully will be paying after the deductible.  *I'm not certain what I will owe at this point.*" (Emphasis added.)

[¶34.]  Without requiring Denice to prove her actual medical costs or waiting for a final bill after insurance consideration, the trial court's holding adopted the

---

11. Denice testified that Russell must have taken some amount of "rent" money out of the salary she received from his car dealership.  She signed over her checks to him so that he could manage her finances.

12. Exhibit W details three months of "Outpatient Misc. Charges."  Two months total $3,205.05 each; one month totals $3,635.63.  This does not include $450 per treatment Denice receives in aid from National Organization for Rare Disorders, Inc., which we assume she considered in reaching the $3,000 figure.

highest suggested figure and charged John with support. When Denice's testimony and evidence on this subject is fully considered, the error of this conclusion becomes apparent.

[¶35.]    The expense budget presented by Denice includes a line for her Tysabri treatment of $525 per month.[13]  On direct examination, she explained that $525 is 15% of the *$3,500* estimated cost of Tysabri, and her insurance covers the remaining 85%.  Therefore, the $525 figure *does not account for* the $450 Denice receives to aid in the costs of Tysabri treatment.[14]  Applying the $450 aid to Denice's budget, her estimated *actual* cost per month for Tysabri is only $75.  This is a far cry from the $3,000 plus she urges this Court to approve on appeal.

[¶36.]    Denice's estimations are wholly inconsistent with each other and cannot reasonably be considered to have satisfied her burden of proving this expense.  There is no basis in evidence which supports the conclusion that Denice's actual need for support for Tysabri is $3,000 per month.  Thus, the amount of her medical bills is mere speculation.  Because the burden is on the moving party, and because Denice has failed to substantiate her claim, any increase of alimony based on this speculation was arbitrarily made.

---

13.    In the final budget, the Tysabri line item states "(deductible also)."  This is used by Denice to reflect that insurance coverage is present, and that the deductible will need to be met before this rate applies.  Denice's annual deductible is "$1,000 with a maximum pay of $2,500."  Finding of Fact § 23.

14.    Denice applied for and received assistance from the National Organization for Rare Disorders, Inc. and was approved for $450 per treatment in co-payment assistance.

## II.  John's ability to pay

> In assessing the obligor's ability to pay alimony, the court may evaluate the obligor's income in relation to his earning capacity to determine whether the obligor has attempted to avoid the alimony obligation by *intentionally reducing* his income.  In doing so, the court may consider whether the obligor has either acted with the *primary goal* of reducing his gross income or has artificially reduced the net income available after expenses through exaggerating personal expenses or inflating overhead costs of a business owned, at least in part, by the obligor.

*Olson*, 1996 SD 90, ¶12, 552 NW2d at 400 (emphasis added).

### A.  John's Income

[¶37.]	Conclusions of Law § 20(b) states:  "John Moore's health is good.  He has an excellent education, has advanced degrees and is clearly very well employable at significant sums."  However, Denice offered no evidence other than John's 2001 income as a measure of what "significant sums" he could receive.  In 2001, John served as a Division Director in the South Dakota Department of Education, earning approximately $62,500 per year.  Since 2001, he has not maintained his credentials or worked in any meaningful capacity outside of the home.

[¶38.]	John is now 60 years old and has been out of his profession for at least seven years.  While his 2001 salary may have been relevant to his earning capacity in 2003, modification proceedings are concerned with *changes* that have occurred *since* the divorce.  Denice presented no evidence that John's 2001 earning capacity is relevant to John's 2008 earning capacity.  Therefore, his 2001 income is inadequate to establish his *present* earning potential.  As the moving party, Denice carries the burden of proving John's earning capacity.  She has not met this burden.

Thus, Conclusion of Law § 30(e) is without a basis in evidence. "e. [John's] employability [ ] exists now just as it did at the time of the original Decree of Divorce."

[¶39.]    John argues that he no longer has an earning capacity of $62,500 per year because he is not qualified to work in his prior position.  He presented testimony that, due to his long unemployment, returning to educational administration would require at least one year's remedial education and recertification in Texas.  Denice does not refute John's need for additional training or certification.[15]

[¶40.]    Furthermore, there is no indication that John's prolonged unemployment was to "avoid the alimony obligation by intentionally reducing his income." *Olson*, 1996 SD 90, ¶12, 552 NW2d at 400.  Given the financial circumstances of John's current marriage, there is no indication that he has intentionally reduced his gross income with the *primary goal* of avoiding alimony. *Id.*  Since retirement, his income has consistently remained close to zero because he has had no need for other income to support himself or his obligation to Denice.

### B.  Luanna's Income

[¶41.]    Absent evidence of John's present earning capacity as a measure of his income, Denice instead attempted to establish that John is able to and should pay increased alimony due to Luanna's income.  The imputation of a new spouse's income to the alimony obligor's is without precedent.

---

15.    Denice maintains that John is still certified for employment in Iowa.  We do not consider this a relevant factor as John and his wife do not reside in Iowa and it would be unreasonable to require him to relocate to Iowa.

[¶42.] While the trial court's findings of fact and conclusions of law do not directly impute this income, because Denice failed to establish John's earning capacity, the repeated references to Luanna's income and assets and the suggestion of John's right to this income cause us to conclude that Luanna's financial position is the only basis used by the trial court to determine John's ability to pay.

[¶43.] Conclusion of Law § 20(c) holds that John is "well able to assist and consult with [Luanna] on her employment activities which creates her bonuses." We believe that conclusion is erroneous. It was based upon Denice's speculation and was not supported by any testimony or other evidence. The mere existence of his education and experience does not mean that he *has* assisted Luanna in her work, directly or indirectly resulting in income, or that he has the capacity to assist in her field, educational sales. Furthermore, simply because Luanna has a job that pays her well does not mean that John can receive similar compensation from her, or any other, employer.

[¶44.] Conclusions of Law §§ 20(d) and (e) confirm our belief that Luanna's income was imputed to John. "d. During the last four years, [John's] current wife has earned an average of approximately $270,000 per year and in the year 2005, earned over $500,000. e. [John] has access to earnings sufficient to pay increased alimony to Ms. Moore."

[¶45.] Whether an alimony obligor's subsequent spouse's financial contributions may be included in determining the obligor's *income* is an issue of

#24896

first impression. Neither party has cited any authority that suggests such an imputation is proper.[16]

[¶46.] This Court has held that cohabitation may be considered in assessing the financial circumstances of the alimony recipient. *See Paradeis*, 461 NW2d 135. However, it should be recognized that a cohabitant of the receiving spouse may not be considered to *increase* the expenses of the recipient spouse.[17] While a new spouse's income might be considered to offset an obligor spouse's living *expenses*, thus freeing more of his or her income for alimony payments, we can find no authority in any jurisdiction in which the new spouse's income is used to supplement the obligor's *income* for alimony modification purposes. We conclude that an alimony obligor's subsequent-spouse's income may not be included as part of

---

16. In *In re* Marriage of Wilson, 63 P3d 1244 (OreCtApp 2003) (referred to by the parties as *In re* Mary Jo Wilson), the alimony obligor voluntarily retired from the FBI at the age of 51, seven months after his divorce and four months after his re-marriage. The obligor then moved for a reduction in alimony payments because of his reduced income. The trial court considered the obligor's new spouse's significant wealth as a factor contributing to the *voluntariness* of the obligor's reduction of income. Among other factors, this was considered as a basis for imputing the *obligor's* pre-retirement income as his earning capacity. The court did *not* impute the new spouse's income to the obligor. In fact, *Wilson* rejects the notion that a new spouse's income might be considered in this manner. "[The new spouse] has no obligation to assist in the payment of spousal support to [the former spouse]. . ." *Id.* at 1247. At most, this authority suggests that John's unemployment is voluntary, thus permitting the imputation of his present earning capacity. As discussed in ¶¶37-40, *supra*, Denice has not established John's present earning capacity.

17. "[W]hen the *expenses* of the recipient are *increased* due to the recipient's voluntary support of persons the obligor is under no duty to support, the court may disregard those expenses to the extent they are claimed by the recipient as evidence of increased 'need.'" *Olson*, 1996 SD 90, ¶15, 552 NW2d at 400 (citation omitted) (emphasis in original).

the obligor spouse's income. Without evidence of *John's* income or earning capacity as the source of John's ability to pay, the trial court has, in reality, required Luanna to pay Denice alimony.[18] This was an error of law.

## CONCLUSION

[¶47.] Denice has established that some circumstances have changed since the divorce. However, she has failed to sufficiently meet her burden of proving or quantifying her needs or John's ability to pay. Denice cohabitates with Russell and the evidence indicates that she receives some benefit from this arrangement, though the amount of support she receives has been unexplored. Similarly, John is in a position of financial dependence on his current wife. While he may be capable of employment outside of the home, Denice has not met her burden in proving John's present earning capacity. Finally, the imputation of income from Luanna to John was an error of law.

[¶48.] While we are not unsympathetic to Denice's medical condition, in view of the circumstances of the case and the applicable law, we hold that the trial court abused its discretion in reaching its conclusion. Granting modification to Denice without requiring her to meet her burdens was "discretion exercised to an end or purpose not justified by, and clearly against, reasoning and evidence." *Horr,* 445 NW2d at 28 (citation omitted).

---

18. Our holding should not be read to preclude a finding of higher earning capacity in a different factual situation where an obligor is intentionally reducing his or her income and receiving the difference by channeling that income through his or her new spouse. No *evidence* has been presented that such activity exists in this case other than Denice's *supposition.*

[¶49.] Further, because we find that Denice has failed to establish adequate grounds for modification, she is not a "prevailing party." Therefore, she was not entitled to the costs awarded. SDCL 15-6-54(d)(1).

[¶50.] Reversed and remanded for proceedings consistent herewith. Appellate attorney fees are denied.

[¶51.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.

[¶52.] MILLER, Retired Justice, sitting for ZINTER, Justice, disqualified.